**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| THE TRAILS, LLC, OVERPECK | § | |
| MANAGEMENT, LLC, and GALWAY | § | |
| CONSTRUCTION, LLC, | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | **Case No.** 1:15-cv-00996-WPL LF |
| | § | |
| STEVEN J. METRO INDIVIDUALLY | § | |
| and d/b/a METRO REAL ESTATE, | § | |
| LLC, WILSON & COMPANY INC., | § | |
| ENGINEERS & ARCHITECTS, and | § | |
| DANIEL AGUIRRE, | § | |
| Defendants | § | |

## AMENDED COMPLAINT[1]

Plaintiffs, The Trails LLC, Overpeck Management, LLC, and Galway Construction, Inc. complain against Defendants, Steven J. Metro Individually and d/b/a Metro Real Estate Company, LLC[2], Wilson & Company, Inc., and Daniel Aguirre for damages caused by their violations of the Racketeer and Corrupt Organizations Act ("RICO"), and their violations under New Mexico state law for Negligence Per Se, Breach of Contract, Breach of Fiduciary Duty, Fraud by Non-Disclosure, Fraud by Affirmative Representation, Tortious Interference with Contracts, Professional Negligence, Gross Negligence, Unjust Enrichment, and Civil Conspiracy.[3]

---

[1] The only changes in this Amended Complaint (as compared with the Original Complaint) are this footnote and paragraph 49, which had previously inadvertently listed 18 U.S.C. §1345 instead of the correct section, 18 U.S.C. §1346.

[2] According to the New Mexico Secretary of State, Metro Real Estate, LLC was formally dissolved on April 16, 2014. However, property at issue in this suit continues to be held in the name of Metro Real Estate, LLC.

[3] Only Defendant Steven J. Metro is a defendant in the RICO claim (Count I). Steven Metro Individually, and d/b/a Metro Real Estate, LLC, Wilson & Company, Inc., and Daniel Aguirre are defendants in the New Mexico state law claims. "RICO Defendant" will refer to Steven J. Metro and "Defendants" will refer collectively to Steven J. Metro, Wilson & Co., Inc., and Daniel Aguirre, unless otherwise noted.

**INTRODUCTION**

1.    This case arises from a long-running scheme perpetrated by Defendant Steven J. Metro, a project manager at Wilson Engineering, to covertly and without the knowledge of Plaintiffs, purchase land for development near the Boca Negra Detention Dam ("BND" or "dam"), a regional storm water detention facility in Albuquerque, New Mexico, and then increase the size of the dam project to service his new land, while disproportionately shifting the cost of the increase onto The Trails. Metro's scheme took place from 2005 to 2012 with the assistance of Ed Adams and Richard Dourte, engineers and managers for the City of Albuquerque, and Daniel Aguirre (and others), and was executed through repeated uses of the U.S. Mail to deceive The Trails and then extort The Trails for more than two times the contract price for the completion of the enlarged dam.

2.    Steven Metro, Ed Adams, and Richard Dourte had a close business, personal, and financial relationship since at least 2004.

3.    Their scheme violates the RICO statute and is a matter of public concern. Wilson & Company, Inc. bills itself as a leading engineering firm for design and construction of projects for local governments throughout the western states. Its record of breaches of fiduciary duties to its clients should be public information.

**PARTIES, JURISDICTION AND VENUE**

4.    Plaintiff, The Trails, LLC ("The Trails"), is a Nevada limited liability company, doing business in New Mexico.

5.    Plaintiff, Overpeck Management, LLC ("Overpeck"), is a Nevada limited liability company, doing business in New Mexico.

6.    Plaintiff, Galway Construction, Inc. ("Galway"), is a Nevada Corporation, doing business in New Mexico.

7.    Defendant, Steven J. Metro ("Metro"), is a citizen of New Mexico and former Executive Vice President, Director, and Project Manager for Wilson & Company.

8.    Defendant, Wilson & Company, Inc., Engineers & Architects ("Wilson Engineering" or "Wilson"), is a Kansas Corporation, doing business in New Mexico.  Wilson holds itself out as engineering, architecture, planning, environmental, survey, and mapping construction company, with offices located in over ten states.   Wilson Engineering is not a defendant in the RICO claim, as described below; however, Wilson Engineering is the RICO enterprise in Count I.

9.    Defendant, Daniel Aguirre ("Aguirre"), is a citizen of New Mexico and currently is the Director and Senior Vice President of Wilson & Company.

10.    This is a RICO action conferring this Court subject matter jurisdiction pursuant to RICO's civil suit provision, 18 U.S.C. §1964(c).

11.    Jurisdiction is also vested in this Court by virtue of 28 U.S.C. §1331 as a federal question.

12.    Because claims brought under New Mexico law are so related to Plaintiffs' claims over which the Court has original jurisdiction that they form part of the same case or controversy, the Court has supplemental jurisdiction over Plaintiffs' common law and state law claims pursuant to 28 U.S.C. §1367.

13.     Venue is proper in this District as many of the facts occurred here and the Defendants

reside or do business here.

## **FACTUAL BACKGROUND**

14.     In 2003, The Trails, a commercial and residential real estate developer, purchased 450

acres of land for approximately $14 million in northwest Albuquerque.  It was

intended to be a "master planned community" with a mixture of residential (homes and

apartment complexes) and commercial real estate.

15.     In order to develop this land, the City of Albuquerque ("the City") required The Trails

to eventually find a permanent solution for dealing with the storm water outflow.  This

became the BND, a regional storm water detention facility to retain the runoff for at

least 5,000 acres upstream, including the 450 acres within The Trails.  The BND was

needed to control the future storm water runoff to downstream development. In the

meantime, The Trails had built a temporary basin to be used for an indefinite period

that was approved by the City.

16.     The City and the Albuquerque Metropolitan Arroyo Flood Control Authority

("AMAFCA"), required that The Trails, and Vista Vieja Development Company,

another developer (later assigned to KB Homes New Mexico Inc. in 2006, also another

developer),[4] pay for 100% of design of the dam and approximately 50% of the total

costs (design plus construction).

17.     In 2005, the Trails, KB Homes, AMAFCA, and the City entered into a contract to

design and build the BND.  The BND project was to be completed in one year, with

---

[4] For ease of reference, due to Vista Vieja Development Company's assignment of the contact to KB
Homes New Mexico Inc., both parties will hereafter be referred to as "KB Homes." Neither Vista Vieja
nor KB Homes are parties in this case.

the design portion of the BND taking approximately six months and the construction portion taking approximately six months.  Under this contract, The Trails was required to pay $525,757 in cash for construction costs to AMAFCA for its share of the costs of the project.  The Trails was also required by AMAFCA to separately contract with Wilson Engineering to design the BND.

18.   The Trails contracted with Wilson Engineering to design the BND in 2005.  The Trails agreed to pay Wilson Engineering $105,148.75 for the design phase, to be paid in periodic incremental installments, until the design of BND was completed and approved by AMAFCA.  (This amount ultimately increased to $209,892.40 by 2012.)

19.   Metro, the Executive Vice President and a Director of Wilson, was the initial project manager for the BND project. Aguirre later became the project manager for the BND project.

20.   But unbeknownst to The Trails, Metro had been buying up property near the dam location, in Special Assessment Districts ("SAD") 227 and 228, with the expectation he could sell this land at substantial profits if the land (and dam) were built and developed.   Metro intended to continue buying lands in these areas over the next few years.

21.   SAD 227 is a large tract of land located near Unser Blvd and Molten Rock Road NW, in Albuquerque, New Mexico. This tract is comprised of primarily residential lots and a small number of commercial lots, and is similar to the tracts of land owned by The Trails.

22.   Beginning in 2004-2005, after Wilson was hired as the engineer/project manager to ascertain the location and alignment of the future Unser Blvd., Metro began buying

5

property within the proposed Unser Blvd Right of Way and SAD 227 in anticipation of selling portions of the property to either the City (for future rights of way) or to third parties (for future new home development).  Soon thereafter, and while Wilson was still under contract with The Trails to design the BND, Metro began purchasing properties in the nearby SAD 228 for the same purposes.

23.   In 2004, Metro transferred at least one lot within SAD 227 (believed to be worth more than $100,000.00) to Dourte.

24.    In 2002-2005, Wilson was awarded project management contracts to provide engineering services to the City within the boundaries and for the benefit and design of SAD 227.  These contracts are valued at approximately $2.3 million.  The work on these contracts continued for a number of years.

25.   By 2006, Metro owned approximately 40% of the land within SAD 227.

26.   In approximately 2006, Metro turned his attention to SAD 228, which is located east of Unser Blvd. and south of Paseo del Norte.  SAD 228 comprises approximately 230 acres of land, and Metro began acquiring lots there.

27.   In 2007, the City again awarded Wilson the project management contracts to provide engineering services for the development/improvement of SAD 228. These contracts allowed Wilson to design the utilities, water drainage, and placement of roads throughout SAD 228 and were also worth millions of dollars.

28.   By 2010, Metro and his business partners were the largest landowners in SAD 228, owning over 30 acres of land there. Dourte had an ongoing interest in Metro's business/real estate activities during this period of time, and in 2013, Dourte also acquired a lot in SAD 228, which is believed to be worth at least $75,000.00.

29.    The development of SAD 227 and SAD 228 was in direct competition with The Trails.

30.    It is also important to note, that both Wilson and Metro were members of the steering and development committee put together by the City to develop SAD 227 and SAD 228.

31.    At no point did Metro ever disclose to Plaintiffs that he had property interests in SAD 227 or 228. Wilson should have also informed The Trails that one of its Executive Vice Presidents and Directors (*i.e*., Metro) was actively acquiring lots to compete against The Trails.  Neither Wilson nor Metro ever informed The Trails of these conflicts of interest.

32.    These omissions and hidden interests were a breach of Wilson/Metro's fiduciary duty to disclose any conflicts of interest to The Trails, as required by New Mexico's professional standards of engineering as enunciated in the Code of Professional Conduct for Engineering and Surveying, Section 16.39.8.9 (D) (Professional Relationships with Employer or Client).

33.    The Trails was unaware that Wilson/Metro had any conflicting interests or that Metro and Dourte stood to personally gain from the BND project which they controlled. The Trails would not have hired Wilson or Metro to design the dam if it had known of these conflicting interests.

34.    The size of the project, along with the cost and timetable, contemplated the building and design of a dam to handle outflow of only 15,000 cubic feet per second, and to service The Trails and the KB Homes developments (and an additional 4,000 acres of surrounding area).

35.     The conflicting interests led to a far larger and more expensive dam than what was contemplated and contracted for, and the larger dam benefitted undisclosed beneficiaries who did not have to share in the substantial costs, but got to reap the benefits of increased property values (such as Metro who was surreptitiously buying up land in SAD 228).

## THE SCHEME TO CONCEAL DEFENDANTS' CONFLICTS OF INTEREST AND TO SHIFT COSTS OF THE ENLARGED DAM TO PLAINTIFFS

36.     SAD 228, unlike SAD 227, required a permanent storm water discharge solution for a portion of the property that would drain to BND. A significant portion of SAD 228 is within the BND watershed, and would therefore benefit from BND's completion, so long as the BND was large enough and constructed in a way so as to accommodate SAD 228.

37.     Metro, however, did not want to finance the cost of the BND to service SAD 228, which would likely cost hundreds of thousands of dollars or more.   Since the flows from SAD 228 (and Metro's other properties) exceeded The Trails' flows, Metro's properties' and the SAD 228 properties' share of the costs would have been much higher than The Trails' share of the costs.  Therefore, Metro devised a scheme to shift the costs to Plaintiffs.

38.     Metro and Wilson also wanted to be paid for designing the larger dam (without telling The Trails about the larger design), and this additional cost was shifted to Plaintiffs.

39.     As a result, a project that was supposed to be completed in just one year took over six years to complete.  In addition, the design costs were more than $200,000.00 over budget, and the BND was ultimately increased in capacity by 300%. All of these

increases occurred under the direction of Wilson and Metro and at the expense of The Trails and KB Homes.

40.     Pursuant to the scheme, Metro was not forthright concerning his financial interests in SAD 227 and SAD 228 and the other properties Metro acquired within the BND area. Metro worked directly with AMAFCA and the City to execute his plan of developing his financial interests and shifting the costs of the enlarged dam onto The Trails. During this time, The Trails was never notified of the drastic changes/enlargement in the design plans, nor was it provided with an opportunity to evaluate or oppose them.

**Metro Used The U.S. Mail To Hide The Conflicts Of
Interest, To Conceal His Work Designing A Larger Dam,
And To Bill Plaintiffs For Additional Work**

41.     From 2005-2012, Wilson Engineering, at Metro's direction, mailed The Trails invoices for its BND design work.   These invoices were sent from Wilson Engineering, 2600 The American Road SE, Suite 100, Rio Rancho, NM 87124, to The Trails (c/o of Longford Homes, Inc., The Trails' authorized billing agent), 7007 Jefferson St., NE, Ste. A, Albuquerque, NM 87109, by U.S. Mail, on the following dates:

   a)  May 20, 2005 for $16,482.09;
   b)  June 17, 2005 for $18,427.19;
   c)  December 28, 2005 for $17,665.10;
   d)  March 1, 2006 for $26,287.19; and
   e)  May 1, 2006 for $21,029.75.[5]

---

[5] As noted below in the paragraph detailing payment, other invoices were sent through at least September 2008.  The Trails has been unable to locate these invoices, but its record of payment (nine separate payments) in response to these invoices is noted below.  It is therefore more than plausible that the invoices that preceded these payments were mailed within the 60 days preceding payment, and that there were likely at least nine separate invoices, not five.  These records can be obtained during discovery from Wilson.

42.   In total, Wilson invoiced The Trails for $209,892.40, which is more than $100,000 over the original agreed upon price in 2005.  This increase was due, in part, to the design of the expanded dam that served Metro's land holdings within SAD 228.

43.   From 2005-2008, The Trails mailed checks to Wilson Engineering to pay these invoices. These payments were sent from The Trails, 3077 East Warm Springs Rd., Las Vegas, NV 89120, to Wilson Engineering, PO Box 94000, Albuquerque, NM 87199-4000, by U.S. Mail, on the following dates:

    a) July 5, 2005 for $16,482.09;
    b) July 20, 2005 for $18,427.19;
    c) February 6, 2006 for $17,665.10;
    d) April 20, 2006 for $26,287.19;
    e) July 5, 2006 for $21,029.75;
    f) May 20, 2008 for $7,155.83;
    g) June 20, 2008 for $12,670.00;
    h) July 20, 2008 for $12,670.00; and
    i) September 2, 2008 for $12,670.00.

44.   In total, The Trails paid Wilson Engineering $145,057.15 for its design work from 2005-2012.

45.   On their face, these invoices described work that was within the scope of Wilson's agreement with The Trails.  However, these invoices were misleading and false because they hid that Metro and Wilson were: a) designing a larger dam that would service SAD 228; and b) billing The Trails for such work. These misleading invoices allowed Metro to continue working on the BND project in order to enlarge the design and to charge The Trails for the work on this undisclosed change in project.

46.   Accordingly, the payments by The Trails were fraudulently induced and unknowingly made in furtherance of the scheme.  These 14-plus (*see* n.4) mailings furthered Metro's scheme, and thus violate 18 U.S.C. §1341, which states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises…for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service…or knowingly causes to be delivered by mail or such carrier according to the direction thereon…shall be fined under this title or imprisoned not more than 20 years, or both.

47.   These invoices were also mailed for the additional purposes of lulling The Trails into believing that Metro and Wilson were performing their contractual obligations without any conflict and in accordance with the New Mexico Code of Professional Conduct for Engineering and Surveying, when in actuality Metro was competing against The Trails.

48.   As such, the U.S. Mail was also used by Wilson and Metro to breach their fiduciary duties to The Trails as imposed by New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9(D)(Professional Relationships with Employer or Client).  This section provides that:

> (D)(1) Licensees shall act in professional matters for each employer or client as fiduciaries and shall avoid conflicts of interest.  Licensees shall disclose all known or potential conflicts of interest to their employers or clients by promptly informing them of any business association, interest or other circumstances which could reasonably be expected to influence their judgment or the quality of their services.
>
> (D)(2)  Licensees shall not accept compensation, financial or otherwise, from more than one party for services on the same project, unless the circumstances are fully disclosed to, and agreed to, by all interested parties.
>
> (D)(4)  Licensees in public service as a member or employee of a governmental body, agency or department shall not participate, directly or indirectly in deliberations or actions which would constitute a conflict of interest with respect to services offered or provided by him, his associates, or the licensee's organization or such governmental body, agency or department.
>
> (D)(5)  Licensees shall not solicit or accept a professional contract from a governmental body on which a principal or officer of their organization

serves as a member, except upon public disclosure of all pertinent facts and circumstances and consent of appropriate public authority.

49.    Each of the 14-plus uses of the mails omitted to inform Plaintiffs of Wilson's and Metro's interests and involvement in the acquisition/development of properties in SAD 227 and SAD 228, including any involvement in the decision(s) to award the SAD project management contracts, furthering the scheme and increasing Plaintiffs' costs.  This violated their fiduciary duties imposed by §16.39.8.9(D) and 18 U.S.C. §1346, which is incorporated by §1341, and therefore is a violation of the mail fraud statute.

**Metro Conspired To Extort Money From The Trails
To Pay For The Enlarged Dam And To Benefit His Financial Interests**

50.    From 2005 through 2012, Metro and Wilson continued to work on the design of the BND project, ultimately altering significantly the design plans of BND to be much larger than originally agreed, so as to service SAD 228, among other developments created after 2005, and properties owned by Metro outside of SAD 228.

51.    In addition, Metro used his knowledge of the expansion of the BND project to continue to acquire property which he knew would be directly benefited by his work for The Trails and which he has used and continues to use to compete directly against The Trails.

52.    In November 2011, The Trails received a revised cost estimate for the BND project, showing that its share of the costs had now increased to approximately $1.1 million. However, the actual design plans, including the specific enlargements, were not provided to The Trails until the Spring of 2012, after the shutdown (described below) commenced.

53.     On December 12, 2011, John Murtagh, Manager of The Trails, requested a meeting with the City and AMAFCA to discuss the long delays and increased costs.

54.     On January 5, 2012, Murtagh met with Dourte, representing the City, and Jerry Lovato, representing AMAFCA (as an Executive Engineer). At this meeting, Murtagh inquired about the specific details of the BND design plans and the raised costs. Dourte refused to provide any details or specifications.

55.     Murtagh objected to the increase in costs The Trails was being required to pay for the BND project, as well as the long delay.  Murtagh also demanded to know if there were other beneficiaries of the BND Project and why they were not being asked to share in the costs.  Murtagh was not provided an answer to his questions.

56.     Dourte responded by telling Murtagh that if The Trails didn't pay, it would be "shut down." Dourte further informed Murtagh that the $1.5 million in performance bonds that the City had required The Trails to post (to ensure a permanent discharge solution for the area in which The Trails owned property) would be called if The Trails did not pay.

57.     Being "shut down" meant that The Trails would not receive any building permits from the City and could not record any future subdivision maps for its properties. Being "shut down" effectively prevented The Trails from carrying out its day-to-day business operations.

58.     At the time of Dourte's threats, the revised BND plans had not even been approved by AMAFCA or even provided to The Trails.  Therefore, The Trails was not required to pay under its contract with the City and AMAFCA.  Nevertheless, from that point on, Dourte shut down The Trails in the manner described above.

59.     Dourte also attempted to call the performance bonds in January 2012 despite The Trails not being in default with the City or AMAFCA, which is the only circumstance under which the performance bonds can be called by the City.

60.     On February 27, 2012, Dourte, working with Metro and Ed Adams (City Special Projects Manager and former City Chief Administration Officer), sent a letter to The Trails that once again demanded that The Trails pay the $1.1 million for the enlarged dam, otherwise The Trails would remain shut down and unable to receive future building permits, plan reviews, and City approval of infrastructures.

61.     In this letter, Dourte also claimed that if The Trails did not pay for the increased costs of the BND project, then it would not be in compliance with the City's requirement that The Trails design and construct a permanent solution for dealing with the storm water outflow. This was not true, however. The Trails had only objected to the increased and disproportionate share of the costs of building the BND.  This letter was therefore sent with the intention of furthering the scheme to harm The Trails.

62.     This letter was also sent, despite the fact that the Trails had expended considerable funds to create an interim water discharge solution (which was approved in writing by the City) for the property owned by The Trails during the pendency of the BND project. As such, at no point during the development of the BND project did the water discharge from the area at issue pose a risk or threat to the community.

63.     Dourte, however, working with Metro and Adams, used The Trails' objection and inquiry into the increased costs as a pretext for the shutdown.  As a property owner within SAD 228, Metro knew that if The Trails were shutdown, landowners and developers in SAD 228 would benefit because their primary competitor would be

unable to operate and sell its land, thus raising the demand for (and the price of) land in SAD 228 by reducing competition for residential and commercial lots in the area at issue. Therefore, this was a "win-win" situation for Metro and those acting in concert with him, because either: 1) The Trails would be forced to pay for SAD 228's use of the expanded BND; or 2) The Trails would be shut down and the value of the SAD 227 and SAD 228 land would increase due to the elimination of a major competitor.

64.   On March 16, 2012, Murtagh met again with Dourte and Adams, on behalf of the City. Metro and Dan Aguirre (another executive of Wilson Engineering) were also present, along with Lovato. At this meeting, Murtagh once again inquired about whether there were any other beneficiaries of the BND project, and who they were, but those present refused to answer or provide any information.

65.   Dourte reiterated his threat to "shut down" The Trails if it did not pay the increased costs for the dam.  Metro openly agreed with this plan to threaten The Trails because Metro knew that he would benefit regardless of whether The Trails acquiesced or whether it was shut down. It was simply a matter of whether Metro (and those conspiring with him) would benefit immediately from the shutdown of The Trails (and the corresponding immediate elimination of competition), or whether Metro (and those conspiring with him) would benefit from a long term increase in value of the properties in and nearby to SAD 228 from the BND, without having to shoulder any of the costs associated with water discharge.

66.   Adams agreed with this course of action as well.

67.   On March 22, 2012, the Assistant City Attorney, at the behest of Dourte, reiterated the terms of the shut down to The Trails in a letter.

68.   AMAFCA did not actually receive approvals from the State Engineer for the new BND plans until May 2012, which means that the City and Metro were attempting to force The Trails to pay for a project to control water discharge that had not even been approved by the local flood authority that governs the approval and design of such projects.

69.   Upon finally receiving the actual plans in May 2012, for the first time, The Trails learned that the BND design was now triple the size originally agreed to in 2005; the BND was now designed to accommodate Metro's properties in SAD 228 (and other properties acquired by Metro); and the BND was now designed to take up to 45,000 cubic feet per second of outfall (as compared to the 15,000 cubic feet per second initially agreed upon). Besides increasing the flow capacity by 300%, site improvements were also added, including landscaping, jogging and bike paths, larger storm infrastructure, and more rock excavation and engineered fill.

70.   Until The Trails agreed to pay the $1.1 million being demanded, the "shut down" remained in effect. This was extortion. Metro, Dourte, and Adams violated 18 U.S.C. §1951 (Hobbs Act), which states in pertinent part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by…extortion or attempts or conspires so to do…in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both…(b) As used in this section…(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. (§1951(a), (b)).

71.   As described above, on at least four separate occasions in 2012 (January 5th, February 27th, March 16th, and March 22nd), Dourte and/or Adams threatened to shut down

The Trails' operation (and continue the shutdown), unless The Trails agreed to pay the additional costs for the enlargement of the BND.

72.     Dourte and Adams, as the City of Albuquerque Engineer and the City Special Projects Manager, respectively, were operating under "official color of right" in threatening The Trails.

73.     In furtherance of this relationship, and as part of their scheme to benefit nearby properties, Dourte, working with Metro, Wilson, and Adams, threatened The Trails in order to force it to pay for the additional design/construction of the BND. As such, Metro conspired with Dourte and Adams to extort additional funding from The Trails, which is a substantive violation of the Hobbs Act.

74.     The actions of Metro, Dourte, and Adams affected interstate commerce because The Trails is a Nevada limited liability company, and it transfers electronic funds between Nevada and New Mexico in connection with the operation of its business described herein. Additionally, the construction of the BND used materials shipped across state lines.

75.     Dourte's and Adams' four separate threats also violated N.M. Stat. Ann. §30-16-9 (extortion), which states:

> Extortion consists of the communication or transmission of any threat to another by any means whatsoever with intent thereby to wrongfully obtain anything of value or to wrongfully compel the person threatened to do or refrain from doing any act against his will. Any of the following acts shall be sufficient to constitute a threat under this section: (A) a threat to do an unlawful injury to the person or property of the person threatened or of another… (§ 30-16-9)

76.     The Trails ultimately remained shut down for ten months, until November 2012. In June 2012, The Trails was forced to commence litigation and arbitration against

AMAFCA in order to lift/end the shutdown. In November 2012, The Trails settled with AMAFCA and agreed to pay $500,000 for the BND and to install an unnecessary storm drain on Universe Blvd., which runs from The Trails to the BND, at a cost to The Trails of over $1.1 million.  Only then did the shutdown end.

77.    The $500,000 amount that The Trails paid was a disproportionate share because SAD 228 (as well as other nearby developments owned by Metro and his associates) were not being required to pay anything, yet still benefiting from the enlarged design.

78.    In addition, the Universe Blvd. storm drain was absolutely unnecessary, due to the fact that the City, AMAFCA, and Wilson had already designed and approved a water drainage solution for this area which was less expensive. The only purpose of this $1.1 million project was to punish The Trails and further delay the development of its land.

### OVERPECK, GALWAY, AND REAL CAPITAL SOLUTIONS[6]
### WERE ALSO VICTIMS OF DEFENDANTS' ACTIONS

79.    In 2011, Real Capital Solutions ("RCS") obtained six parcels of land located in The Trails: The Trails Unit 2, Tracts 1, 5, 7, 8, and 9A.

80.    In May 2011, RCS hired Galway as the General Contractor and hired Overpeck as the Project Manager to build approximately 400 residential lots in Tracts 1, 5, 7, 8, and 9A to be sold to DR Horton Homes.

81.    In June 2011, RCS hired Galway as the General Contractor and hired Overpeck as the Project Manager to build 242 apartment units at The Trails Unit 2, which would be known as "Cantata."

---

[6] Real Capital Solutions is not a party in this lawsuit.

82.     When Dourte threatened to shut down The Trails on the four occasions in 2012, he also threatened to shut down the other development projects within The Trails' master planned community, which were being undertaken by RCS, Overpeck, and Galway.

83.     When The Trails was shut down in 2012, all new construction at Cantata ceased, and the entitlement processes (allowing the installation of public improvements) for the lots located at Tracts 1, 5, 7, 8, and 9A also ceased, resulting in the stoppage of all work. Thus, unless The Trails and/or RCS agreed to pay the additional money for the larger BND, RCS, Overpeck, and Galway (as well as The Trails), would all be shut down, and the City would not review any lot plans or release any Cantata building permits, causing these projects to effectively stop.

84.     Ultimately, as part of The Trails' settlement with AMAFCA to end the shutdown, RCS was forced to pay $580,000 for a portion of the BND enlargement, even though RCS was not part of the 2005 agreement.  RCS was also required to post a performance bond in the amount of $724,000.00 for The Trails' Universe Blvd. storm drain.

85.     As a result, RCS fired Overpeck and Galway from their contracts on Tracts 1, 5, 7, 8, and 9A. The 10 month delay caused by the shutdown also resulted in Overpeck and Galway incurring additional costs at Cantata.

86.     During the shutdown, Metro (and those acting in concert with him) sold lots in SAD 228 and surrounding areas directly to developers and in direct competition with The Trails and RCS.

**COUNT I:  RICO CONSPIRACY**
**PLAINTIFFS' CLAIMS AGAINST METRO FOR VIOLATION OF 18 U.S.C. §1962(d)**

87.     The preceding paragraphs are incorporated herein as though fully set forth below.

88.    Through his mail fraud scheme and the subsequent extortion scheme conducted with

Dourte and Adams, Metro violated or conspired to violate 18 U.S.C. §1962(c), which

states:

> It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct
> of such enterprise's affairs through a pattern of racketeering activity or
> collection of unlawful debt.

89.    Metro is a "person," within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

90.    These schemes constitute a "pattern" of racketeering activity pursuant to 18 U.S.C.

§§1961(1)(A), 1(B), and (5), which began in 2005 and continued through at least

2012.

91.    Wilson Engineering was a corporation which affected interstate commerce.  As such,

it is a RICO enterprise pursuant to 18 U.S.C. §1961(4).   Metro used Wilson

Engineering to carry out his scheme to enrich it and himself, at Plaintiffs' expense.

92.    Wilson Engineering affects interstate commerce because it operates in several states.

93.    As a direct and proximate result of, and by reason of, this pattern of racketeering,

Plaintiffs, The Trails, Overpeck, and Galway, have been injured in their business or

property, within the meaning of 18 U.S.C. § 1964(c) in the following ways:

a)  The Trails has been damaged by over $1 million in increased costs/share of

the BND; extra business costs/lost profits for the ten months that it was unable

to operate; and legal fees caused by the shutdown.

b)  Overpeck has been damaged in the amount of over $2 million in lost profits

when it was fired by RCS from its work on Tracts 1, 5, 7, 8, and 9A because

of the shutdown/RCS's forced payments to build the dam; and from extra

business costs/lost profits for the ten months it was unable to operate at Cantata during the shutdown.

c) Galway has been damaged in the amount of over $500,000 in lost profits incurred when it was fired by RCS from its work on Tracts 1, 5, 7, 8, and 9A because of the shutdown/RCS's forced payments to build the dam; and from extra business costs/lost profits for the ten months it was unable to contractually perform at Cantata during the shutdown.

94. Plaintiffs acknowledge that Metro may not have personally mailed the items alleged to have violated the mail fraud statute or personally made the extortionate threats to Mr. Murtagh and The Trails. But, Metro caused the mailings to be sent by a subordinate(s) at Wilson and enlisted Dourte and Adams to make the threats. Thus, Metro, Dourte, and Adams conspired to extort The Trails and carried out that agreement, as detailed above. Accordingly, the RICO claim is brought against Metro pursuant to §1962(d), for conspiring to violate §1962(c).

95. Therefore, Metro violated §1962(d), which states that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection… (c) of this section." Metro is liable for all the damages caused by all the racketeering acts committed by any of his co-conspirators.

96. WHEREFORE, pursuant to §1964(c), Plaintiffs demand judgment against Metro for three times their damages, which are at least $3.5 million, plus pre-judgment interest, taxable costs, and reasonable attorney's fees. Plaintiffs also demand an injunction against Metro from further RICO violations and from further participation in Wilson Engineering. Plaintiffs also request a jury trial.

### COUNT II: THE TRAILS' CLAIM AGAINST
### METRO, AGUIRRE, AND WILSON FOR NEGLIGENCE PER SE

97.     The preceding paragraphs are incorporated herein as though fully set forth below.

98.     Metro, Aguirre, and Wilson Engineering were licensees under New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9 (D) (Professional Relationships with Employer or Client).

99.     Wilson was hired by The Trails in 2004 and 2005 to provide engineering design work.

100.    Metro was the initial BND project engineer. Aguirre took Metro's place as BND project engineer after the BND design commenced.

101.    Metro, Aguirre, and Wilson were required to follow and adhere to New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9.

102.    The Trails' contract with Wilson also required that it comply with all applicable federal, state, or local laws, ordinances and/or regulations, and that it indemnify The Trails against loss due to Wilson's violations of same.

103.    As described above, Metro repeatedly violated New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9 (D) (1), (2), (4), and (5).  Aguirre also violated these provisions.

104.    The Trails did not learn of these violations until 2012, when it first discovered that Metro had been acquiring property in SAD 227 and SAD 228, and that Wilson had obtained no bid contracts in SAD 227 and SAD 228.

105.    Had Metro and Wilson disclosed these conflicts and contracts in 2004 and 2005, The Trails would never have hired Wilson and/or Metro/Aguirre to perform the BND design work and/or would have terminated Wilson and/or Metro/Aguirre immediately.

106.    These violations caused Plaintiff damages of over $1 million in increased costs/share of the BND; extra business costs/lost profits for the 10 months that it was unable to operate; and legal fees to deal with the shutdown.    These violations also caused The Trails to be damaged in amount exceeding $140,000.00 for the BND design fees paid to Wilson Engineering.

107.    Wilson Engineering was Metro's and Aguirre's employer at all relevant times from 2005 through 2012 and was responsible for supervising their work and compliance with applicable regulations and codes.

108.    Wilson Engineering, as Metro's and Aguirre's employer, is vicariously liable for Metro's and Aguirre's breaches based on respondeat superior principles.

109.    Wherefore, Plaintiffs request judgment against Metro, Aguirre, and Wilson for damages sufficient to fully compensate Plaintiffs for all injuries and damages described in this count, both actual, special, and/or equitable, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief, both general and specific, as the Court deems just and proper. Plaintiffs hereby request and demand a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

### COUNT III: THE TRAILS' CLAIM AGAINST WILSON FOR BREACH OF CONTRACT

110.    The preceding paragraphs are incorporated herein as though fully set forth below.

111.    The Trails and Wilson entered into and executed a valid and enforceable contract for services related to the design and construction of the BND.

112.   In good faith, The Trails tendered performance and fully and faithfully complied with its material obligations and conditions precedent under the contract, including payment under the contract.

113.   Wilson, however, materially breached the contract by exceeding the scope of the original design of the BND, failing to complete the project in a timely manner, failing to comply with all applicable federal, state, and/or local laws, ordinances and/or regulations, failing to indemnify The Trails against loss due to Wilson's violations of the agreement, failing to indemnify The Trails for Wilson's profession negligence, and depriving The Trails of the benefits that could have been reasonably anticipated from the full performance thereof.

114.   Wilson has additionally breached the implied covenant of good faith and fair dealing with respect to its performance of the contract.   Wilson failed to adhere to this covenant by imposing excessive costs and delays regarding the BND project, failing to disclose all material changes being considered and made to the BND plans, and failing to disclose that the BND expansion was going to benefit Metro and others not sharing in the costs.

115.   Furthermore, Wilson's conduct towards The Trails was malicious, reckless, wanton, oppressive, and/or fraudulent, and thus, The Trails is entitled to the recovery of punitive damages from Wilson. The Trails seeks an award of punitive damages in an amount reasonably related to its injuries and to the damages given as compensation and not disproportionate to the circumstances.

116.   All conditions precedent under the contract, if any, were performed by The Trails, excused or waived by Wilson, and/or otherwise satisfied by The Trails.

117.   Wherefore, Plaintiff requests a judgment against Wilson for damages sufficient to fully compensation Plaintiff for all injuries and damages described in this count, both actual, special, and/or equitable, for pre- and post-judgment interest as allowed by law, for all costs and reasonable and necessary attorneys' fees incurred and allowed pursuant to the contract between the parties, and for such other and further relief, both general and specific, as the Court deems just and proper. Plaintiff hereby requests and demands a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

### COUNT IV:  THE TRAILS' CLAIM AGAINST WILSON METRO, AND AGUIRRE FOR BREACH OF FIDUCIARY DUTY

118.   The preceding paragraphs are incorporated herein as though fully set forth below.

119.   Metro, Aguirre, and Wilson Engineering were licensees under New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9 (D) (Professional Relationships with Employer or Client).

120.   Metro, Aguirre, and Wilson were required to follow and adhere to New Mexico's Code of Professional Conduct for Engineering and Surveying §16.39.8.9, including §16.39.8.9 (D) (1), (2), (4), and (5).

121.   The Trails' contract with Wilson also required that it comply with all applicable federal, state, and/or local laws, ordinances and/or regulations, and that it indemnify The Trails against loss due to Wilson's violations of same.

122.   A fiduciary relationship existed between The Trails and Defendants.  This fiduciary relationship arose from the regulations cited above, and the fact that Wilson, as a firm providing professional engineering services, and Metro and Aguirre, as licensed Professional Engineers, owe certain fiduciary duties to their clients.

123.    Metro, Aguirre, and Wilson failed to live up to these code provisions and continued to breach the fiduciary duties they owed to The Trails, by among other things:

- Failing to act in a loyal manner towards The Trails;
- Failing to act with the utmost good faith towards The Trails;
- Failing to be candid with The Trails;
- Failing to refrain from self-dealing and placing themselves in a position where self-interests conflict with their obligations as a fiduciary;
- Failing to act with integrity of the strictest degree towards Plaintiffs;
- Failing to deal with The Trails in a fair and honest manner;
- Failing to exercise reasonable discretion;
- Benefitting at the expense of The Trails;
- Failing to fully disclose all matters to The Trails; including as they related to activities in direct competition with The Trails; and/or
- Unilaterally changing the plans of the BND project without The Trails' knowledge or input.

124.    Additionally, as described above, Metro repeatedly violated these code provisions.

125.    The fiduciary duties breached give rise to a presumption of unfairness and necessitate the imposition of a harsh liability standard. Metro, Aguirre, and Wilson have taken gratuity, benefit and acquisition of interests adverse to The Trails without a full disclosure, oppressed The Trails knowledge and involvement, and have taken advantage of opportunities that have presented themselves as a direct or indirect result of the fiduciary relationship.

126.    As fiduciaries, Metro, Wilson, and Aguirre have much more than the traditional obligation not to make any material misrepresentations; they have an affirmative duty to make a full and accurate confession of all fiduciary activities, transactions, profits, and mistakes. The mere failure of the fiduciary to disclose all aspects of the transaction constitutes a breach of fiduciary duty as a matter of law. The duty of full disclosure of all material facts related to activities in the scope of the fiduciary relationship is not diminished by the fact that strained relations may have arisen between the parties.

127.   The fiduciary duties breached by Metro, Aguirre, and Wilson have caused injury to The Trails and direct benefits to these Defendants.  Excessive and unnecessary costs and delays have been suffered by The Trails, while these Defendants have benefited through excessive profits, enhanced property values, and other personal gains.  The Trails have suffered actual damages, including benefit of the bargain damages, out-of-pocket expenses, lost profits, incidental and consequential damages, reliance damages, and other special fiduciary damages.

128.   The Trails did not learn of these violations until 2012, when it first discovered that Metro had been acquiring property in SAD 227 and SAD 228, and that Wilson had obtained no bid contracts in SAD 227 and SAD 228.

129.   Had Metro, Aguirre, and Wilson disclosed these conflicts and contracts in 2004 and 2005 (or any time thereafter), The Trails would never have hired Wilson, Aguirre, and/or Metro to perform the BND design work and/or would have terminated them immediately.

130.   These violations caused Plaintiff damages of over $1 million in increased costs/share of the BND; extra business costs/lost profits for the 10 months that it was unable to operate; and legal fees to deal with the shutdown. These violations also caused The Trails to be damaged in amount exceeding $140,000.00 for the BND design fees paid to Wilson Engineering.

131.   As a result of the injuries The Trails have suffered because of Metro, Aguirre and Wilson's actual fraud or malicious breach of fiduciary duties, The Trails are also entitled to exemplary damages. An award of exemplary damages to The Trails is proper where, as here, self-dealing by a fiduciary has occurred, secret negotiations

have occurred, and a fiduciary has wrongly or secretly profited at the expense of those to which it owes a fiduciary duty. Exemplary damages are also appropriate in a situation such as in this case, where a fiduciary intended to gain an additional benefit for itself.

132.   Wherefore, Plaintiff requests judgment against Metro, Aguirre, and Wilson for damages sufficient to fully compensate Plaintiffs for all injuries and damages described in this count, both actual, special, and/or equitable, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief, both general and specific, as the Court deems just and proper. Plaintiff hereby request and demand a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

## COUNT V:  THE TRAILS' CLAIM AGAINST WILSON AND METRO FOR FRAUD BY NON-DISCLOSURE AND FRAUD BY FALSE REPRESENTATION

133.   The preceding paragraphs are incorporated herein as though fully set forth below.

134.   Wilson and Metro concealed from or failed to disclose certain material facts to The Trails, despite their duty to disclose the material facts.

135.   Wilson and Metro failed to disclose information related to the personal actions of Metro.  Such information includes the fact that Metro, members of Metro's family, and the Metro Entities owned and continued to acquire property that was being directly benefited by the BND project.

136.   The information was material because the basis of the benefit of the bargain between The Trails and Wilson had to do with the BND project, and the non-disclosure of

information was directly related to how the subsequent expansion of the BND affected properties owned by Metro and those affiliated with him.

137. Metro, as an employee of Wilson and initial project manager for the BND project, deliberately remained silent and did not disclose that he would personally benefit from the BND project.

138. Further, in recommending the shutdown to the City, Metro knew that he would benefit from The Trails' inability to develop and sell its land, because he held and subsequently sold land in direct competition with The Trails, who Metro also worked for via his employment for Wilson.

139. By deliberately remaining silent, Wilson and Metro intended for The Trails to act without the relevant knowledge that the engineering firm it hired to complete the BND project would be directly managed by an individual with interests directly in opposition to those of The Trails.

140. The Trails justifiably relied on Wilson's and Metro's deliberate silence by employing and continuing to employ Wilson.

141. Wilson and Metro had a duty to disclose information concerning the full scope of the plans for the BND project, including information related to the redesign/enlargement of the project, because Wilson previously and partially disclosed certain information to The Trails concerning the BND project, which created a substantially false impression regarding the design and construction of the BND.

142. Wilson also had a duty to disclose plans and information related to the redesign/enlargement of the BND project, because of the contractual relationship that

existed between Wilson and The Trails, and because this relationship was significantly affected by the redesign/enlargement of the BND project.

143.   On multiple occasions, The Trails demanded to know if there were other beneficiaries of the BND project and why other beneficiaries were not being asked to share in the costs.  Even though Wilson and Metro knew the answers to these specific questions, The Trails was never provided with an answer.

144.   The existence of the fiduciary relationship created a duty upon Wilson and Metro to disclose any conflicts of interest which existed between Wilson and Metro and The Trails.

145.   Wilson and Metro also failed to disclose certain information in violation of the requirement to do so under New Mexico's Code of Professional Conduct for Engineering and Surveying §§ 16.39.8.9(D)(1), (2), (4), and (5).

146.   Wilson and Metro knew The Trails was ignorant of the various nondisclosed facts and that The Trails did not have an equal opportunity to discover the facts.

147.   Wilson and Metro were deliberately silent when they had a duty to speak, and by deliberately remaining silent and not being transparent and forthright in disclosing the facts, Wilson and Metro intended to induce The Trails to take some action or refrain from acting.

148.   The Trails relied on Wilson and Metro's' nondisclosure and was injured as a result of acting without the knowledge of the undisclosed facts, resulting in damages based on the increased costs of the BND project and the shutdown of The Trails' business.

149.   In addition and in the alternative to fraud by non-disclosure, Wilson and Metro's representations regarding the scope and development of the BND project were false in

that they consisted of words and other conduct suggesting to The Trails that facts were true when in actuality they were not.  The false statements of fact were untrue, deceptive, and misleading regarding past and present facts.

150.    Wilson and Metro fraudulently represented that the design of the BND project was the optimal and most reasonable solution for the drainage issues faced by The Trails.

151.    Wilson and Metro further represented that The Trails and KB Homes were the only near term beneficiaries of the BND project.

152.    Wilson and Metro further made representations concerning the necessity (or lack thereof) of the $1.1 million storm drain project on Universe Blvd. that were not consistent with prior representations that Wilson and Metro had made regarding the design and approval of a much less expensive water drainage solution for the area.

153.    Wilson and Metro's false representations were material in that they were important and influential in The Trails' decision to enter into a contract with Wilson and to continue to employ Wilson throughout the BND project.

154.    Wilson and Metro made the false representations knowing they were false and/or made the false representations recklessly, as positive assertions, and without knowledge of their truth.

155.    Wilson and Metro intended or had reason to expect that The Trails would act in reliance on the false representations and The Trails actually and justifiably relied on these Defendants' representations to their detriment and injury.  Wilson and Metro's false representations directly and proximately caused injury to The Trails.

156.    To the extent The Trails' injuries resulted from Wilson and Metro actual fraud or malice, The Trails is entitled to exemplary damages.

157.   Wherefore, Plaintiff requests a judgment against Metro and Wilson for damages sufficient to fully compensate Plaintiff for all injuries and damages described in this count, both actual, special, and/or equitable, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief, as the Court deems just and proper.  Plaintiff also requests a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

### COUNT VI:  PLAINTIFFS' CLAIMS AGAINST WILSON AND METRO FOR TORTIOUS INTERFERENCE WITH CONTRACTS

158.   The preceding paragraphs are incorporated herein as though fully set forth below.

159.   Plaintiffs had contracts with RCS concerning the development of six parcels of land located in The Trails.  RCS hired Galway and Overpeck to develop approximately 400 residential lots to be sold to DR Horton Homes and to build 242 apartment units at Cantata.

160.   When The Trails was shut down in 2012, all new construction at Cantata ceased, and the entitlement processes (allowing the installation of public improvements) for the lots that RCS had contracted with Plaintiffs to develop also ceased, resulting in the stoppage of all work.

161.   RCS was ultimately forced to pay $580,000 for a portion of the BND enlargement and required to post a performance bond in the amount of $724,000.00 for The Trails' Universe Blvd. storm drain.  As a result, RCS fired Plaintiffs from their contracts.

162.   During the shutdown, Metro (and those acting in concert with him) sold lots in SAD 228 and surrounding areas directly to developers and in direct competition with The Trails and RCS.

163.   Wilson and Metro willfully and intentionally interfered with Plaintiffs' contracts with RCS by intentionally delaying the construction and development of the BND, as well as encouraging and/or directing the City to impose a shutdown on Plaintiffs.

164.   Wilson and Metro's interference proximately caused injury to Plaintiffs, which resulted in the loss of the contracts, as described herein.

165.   To the extent Plaintiffs' injuries resulted from Defendants' malice or actual fraud, Plaintiffs are entitled to exemplary and/or punitive damages.

166.   Wherefore, Plaintiffs request a judgment against Metro and Wilson for damages sufficient to fully compensate Plaintiffs for all injuries and damages, both actual, special, and/or equitable, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief,  as the Court deems just and proper. Plaintiffs also request a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

## COUNT VII:  THE TRAILS' CLAIMS AGAINST WILSON, METRO, AND AGUIRRE FOR PROFESSIONAL NEGLIGENCE

167.   The preceding paragraphs are incorporated herein as though fully set forth below.

168.   The Trails and these Defendants (Wilson, Metro, and Aguirre) established a professional relationship when The Trails retained Wilson as its professional engineering firm, and these Defendants provided engineering services to The Trails. Defendants are licensed Professional Engineers and were project managers for the BND project.

169.   As Professional Engineers, Wilson, Metro, and Aguirre are required to deal with The Trails in a fair and transparent manner and provide professional engineering services that are in the best interests of The Trails.  Wilson, Metro, and Aguirre owed a duty to

The Trails to exercise the care and skill of a reasonably well-qualified professional practicing under similar circumstances.

170. Wilson, Metro, and Aguirre breached the standard of care that arose from the professional relationship by failing to complete the needed work for the BND project in a timely and professional manner, failing to inform The Trails of the redesign and enlargement of BND, and imposing excessive, unnecessary and disproportionate costs upon The Trails that benefited these Defendants and others that were not required to share in the costs.

171. To the extent The Trails' injuries resulted from these Defendants' gross negligence, The Trails is entitled to exemplary damages.

172. Wherefore, Plaintiff requests a judgment against Metro, Aguirre, and Wilson for damages sufficient to fully compensate Plaintiff for all injuries and damages described in this count, both actual, special, and/or equitable, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief, as the Court deems just and proper. Plaintiff also requests a jury trial, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

## COUNT VIII:  PLAINTIFFS' CLAIMS AGAINST METRO FOR UNJUST ENRICHMENT

173. The preceding paragraphs are incorporated herein as though fully set forth below.

174. Metro had knowledge that he, Dourte and/or Adams were acting in concert illegally against The Trails.  Metro benefited from the illegal acts due to the increases in value of his property holdings in the areas impacted by the BND project.

175. Plaintiffs are thus entitled to recover from Metro these ill-gotten gains.

176.   Wherefore, Plaintiffs respectfully pray for a judgement against Metro for damages sufficient to fully compensate Plaintiffs for all injuries and damages described in this count, for pre- and post-judgment interest as allowed by law, and for such other and further relief, as the Court deems just and proper. Plaintiffs request a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P. 38.

### COUNT IX:  PLAINTIFFS' CLAIM AGAINST WILSON, METRO, AND AGUIRRE, FOR CIVIL CONSPIRACY

177.   The preceding paragraphs are incorporated herein as though fully set forth below.

178.   Wilson, Metro, and/or Aguirre, were members of a combination of two or more persons.

179.   The object of Defendants' combination was to accomplish an unlawful purpose, and/or a lawful purpose by unlawful means, through their wrongful actions.

180.   The wrongful actions of Defendants supporting an unlawful purpose include, but are not limited to:  acts of fraud based upon representations relating to the BND project, tortious interference with Plaintiffs' existing contracts with RCS, knowing failure of Defendants to disclose facts material to the BND project and Defendants' conflicts of interest, and extensive breaches of fiduciary duties that were owed to The Trails.

181.   The following are a few of the instances in which Defendants conspired to achieve a lawful purpose through the use of unlawful means:  conspiring to force Plaintiffs out of business by imposing the illegal shutdown/moratorium in 2012 in order to force Plaintiffs out of business; conspiring to acquire property near the BND at low prices and selling the property for a large profit by committing fraud; and conspiring to compete with Plaintiffs by violating the professional engineer's duty to disclose conflicts of interest with a client.

182. The actions of Metro and Aguirre were outside the scope of their capacity as employees and/or agents of Wilson, as they acted for personal purposes and/or received personal gains as the result of their actions. A corporation can conspire with its agent if the agent is acting in a capacity other than as a corporate agent or is acting for personal purposes.

183. The Defendants had a meeting of the minds on the object or course of action, and Defendants knew that their acts would result in harm to Plaintiffs.

184. To accomplish the objective of their agreement, at least one member of the combination committed an unlawful, overt act in furtherance of the conspiracy.

185. The law is clear that as long as one of the conspirators is liable for a civil wrong, then the action will survive against all conspirators. A civil action in damages lies against Wilson and Metro arising out of Plaintiffs' claims for common law fraud, fraud by non-disclosure, breach of fiduciary duty, and tortious interference with existing contracts.

186. Defendants' wrongful actions proximately caused injury to Plaintiffs consisting of both actual and exemplary damages. Defendants are jointly and severally liable for all acts done by any of them in furtherance of the unlawful combination.

187. Wherefore, Plaintiffs request a judgment against Defendants for damages sufficient to fully compensate Plaintiffs for all injuries and damages described in this count, for punitive and exemplary damages, for pre- and post-judgment interest as allowed by law, and for such other and further relief as the Court deems just and proper Plaintiffs request a trial, by jury, on all issues properly submitted pursuant to Fed. R. Civ. P.

Respectfully submitted,

**BROCKETT & McNEEL LLP**
TGAAR Tower
24 Smith Road, Suite 400
P. O. Box 1841
Midland, TX  79702
(432) 686-7743
(432) 683-6229 [FAX]

By:___/s/ Jason B. Hamm_____
    JASON B. HAMM
    jhamm@brockettmcneel.net
    MATTHEW FRENCH
    mfrench@brockettmcneel.net

       *and*

**FOSTER, P.C.**
150 N. Wacker Dr., Ste. 2150
Chicago, IL 60606
(312) 726-1603
(866) 470-5738 [FAX]

By:___/s/ Howard W. Foster_____
    HOWARD W. FOSTER
    hfoster@fosterpc.com
    MATTHEW GALIN
    mgalin@fosterpc.com

**ATTORNEYS FOR PLAINTIFFS**